**BOROUGH OF MONTOURSVILLE,**
**Appellant**

v.

**MONTOURSVILLE POLICE**
**BARGAINING UNIT.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2008.

Decided Oct. 17, 2008.

Ryan M. Tira, Williamsport, for appellant.

Anthony M. Caputo, Harrisburg, for appellee.

BEFORE: PELLEGRINI, Judge, FRIEDMAN, Judge, and LEAVITT, Judge.

OPINION BY Judge FRIEDMAN.

Borough of Montoursville (Borough) appeals from the September 26, 2007, order of the Court of Common Pleas of Lycoming County (trial court), which denied the Borough's petition for review and reversal of an arbitrator's award directing the Borough to increase the wage rate of Kurt Hockman (Grievant), a Borough police officer. We affirm.

Except for the Chief of Police, police officers employed by the Borough are represented by the Montoursville Police Bargaining Unit (Union), pursuant to the act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10 (Act 111). The Borough and the Union were parties to a collective bargaining agreement (CBA) in effect from January 2000 through December 31, 2002 (2000 CBA). Article XIII of the 2000 CBA provided titles and pay classifications for the police officers, and Article XIV of the 2000 CBA set forth their salary rates. Under the 2000 CBA, a patrolman third class (PO3) received an annual base salary of $27,500, and each time an officer's title and pay classification changed, the officer's salary would increase by an amount equal to 2.5% of the PO3 base pay.[1]

1. Specifically, the 2000 CBA provides, in relevant part, as follows.
### ARTICLE XIII
TITLES AND PAY CLASSIFICATIONS
A. Titles and pay classifications shall be as follows:
1. Captain—five (5) years of service required. (test required)
2. Lieutenant—five (5) years if [sic] service required. (test required)
3. Sergeant—five (5) years of service required. (test required)
4. Corporal—two (2) years of service required. (test required)
5. Patrolman First Class—five (5) years of service required. (automatic)
6. Patrolman Second Class—three (3) years of service required. (automatic)
7. Patrolman Third Class—one (1) year of service required. (automatic)
8. Probationary Patrolman—less than one (1) year of service. (test required)

Upon expiration of the 2000 CBA, the parties attempted to negotiate, but failed to execute, a CBA for the period of January 1, 2003, through December 31, 2007 (2003 CBA).[2] However, on February 26, 2003, the parties signed a Memorandum of Understanding (MOU) that set out officers' titles and pay classifications, established Probationary Patrolmen's salaries, provided individual adjustments to the salaries of the Borough's full time officers, and specified salary increases for each year from 2003 through 2007.[3] A chart attached to the MOU reflected the salaries of the officers from 2002 through 2005.

In March of 2003, the Borough determined there was an error in the calculation of three of the officer's pay rates in the MOU, and it attempted to reduce those pay rates. The Union grieved the action for those officers, and the matter proceeded to arbitration. On February 20, 2004, the arbitrator directed the Borough to reinstate the wage rates for the three grievants as negotiated in the MOU (Skonier Award).[4]

Grievant was initially employed by the Borough on August 18, 2001, and he progressed through the ranks, reaching the status of Patrolman First Class (PO1) on

*ARTICLE XIV*
SALARY RATES

A. Effective January 1, 2000, 2001, and 2002, The base pay scale shall be as follows: a Patrolman Third Class shall be paid $27,500.00 annually. A Captain shall be compensated at a rate of fifteen percent (15%) above the base salary of the Patrolman Third Class; a Lieutenant, twelve and one-half percent (12.5%); a Sergeant, ten percent (10%); a Corporal, seven and one-half percent (7.5%); a Patrolman First Class, five percent (5%); and a Patrolman Second Class, two and one-half percent (2.5%). Any officer who's [sic] "Title and Pay Classification" changes, as outlined by Article XIII, shall be eligible for an increase equal to two and one-half percent (2.5%) the Patrolman Third Class base pay.
(R.R. at 76a–77a.)

2. Although the 2003 CBA was signed by the Borough Council President, Borough Council Secretary/Treasurer and the Mayor, the 2003 CBA was not signed by Union representatives. Like the 2000 CBA, the 2003 CBA sets forth titles and pay classifications for officers from Probationary Patrolmen to Captain, and it provides that any officer whose title and pay classification changes will be eligible for an increase equal to 2.5% of the PO3 base pay for each promotion. (Arbitrator's op. at 6–7, R.R. at 89a–90a.)

3. The MOU provides, in relevant part, as follows.

*MEMORANDUM OF UNDERSTANDING*

4. Titles and pay classifications Ref page 8 Article XIII(a):
Captain—five years of service required. (test required)
Lieutenant—five years if [sic] service required. (test required)
Sergeant—five years of service required. (test required)
Corporal—two years of service required. (test required)
Patrolman First Class—five years of service required. (automatic on date of hire)
Patrolman Second Class—three years of service required. (automatic on date of hire)
Patrolman Third Class—one year of service required. (automatic on date of hire)
5. Salary—Probationary Patrolman salary will be increased to $28,500. Effective January 1, 2003.
6. Salary—Each full time officer—Wages effective 01/01/03. There shall be an individual adjustment as follows:

| | |
|---|---|
| R.Bonnell | $1,100 |
| J.Gyurina | $1,050 |
| W.Hagemeyer | $1,050 |
| K.Hockman | $1,000 |
| T.Metzger | $1,050 |
| M. Storms | $1,000 |

Effective 01/01/03, there shall be a 4% increase added to the adjusted sum [each year].
(Arbitrator's op. at 7–8, R.R. at 90a–91a.)

4. In September of 2003, the parties went to interest arbitration over an issue regarding post-retirement medical benefits. That interest arbitration award states that, except for the issue of post-retirement health insurance, all disputes between the parties were resolved in the MOU/Skonier Award.

August 18, 2006. In June of 2006, Grievant informed the Chief of Police that he was applying for a mortgage and needed to know what his rate of pay would be when he reached five years of employment in August 2006. In response, the Chief of Police provided Grievant with a letter stating that Grievant would begin receiving $19.61 per hour, or $40,792.97 per year, effective August 18, 2006. Subsequently, the Chief of Police submitted a change-of-classification raise for Grievant indicating an increase of $3.21 per hour, bringing Grievant from $16.40 per hour to $19.61 per hour.

After reviewing the requested increase for Grievant, the Borough's Secretary/Treasurer determined that it was incorrect. Relying on contract language stating that increases from classification changes would be 2.5% of the base pay of a PO3, the Secretary/Treasurer believed that the correct increase should have been $.35 per hour, bringing Grievant from $16.40 to $16.75 per hour, or $34,840 per year. The Secretary/Treasurer adjusted Grievant's pay rate accordingly and notified the Borough Council, Mayor and Solicitor of his action.

On September 1, 2006, after finding that he was not being paid $19.61 per hour, Grievant filed a grievance, and the matter proceeded to arbitration before an arbitrator (Arbitrator) provided through the American Arbitration Association (AAA). The issue before the Arbitrator was "Whether the Borough properly granted the grievant a raise upon reaching Patrolman First Class status by increasing his wages by an amount equal to two and one-half percent of the Patrolman Third Class salary which is provided in Article XIV, A, of the collective bargaining agreement? If not, what should be the remedy?" (Arbi-

trator's op. at 4, R.R. at 87a.) At a hearing held on April 27, 2007, the parties agreed that this was a contract interpretation case, and they presented testimony, exhibits and argument in support of their respective positions.

The Union took the position that, under the 2000 CBA, patrolmen in the same classification were not paid the same rates; instead, each time there was a move up to a new class, the patrolman would receive an increase equal to 2.5% of a PO3 base wage. However, according to the Union, the MOU signed by the parties changed the pay practice so that all patrolmen in the same classification earned the same salary. The Union maintained that, although this interpretation was upheld in the Skonier Award and verified by the Chief of Police's letter, when Grievant reached PO1 status, the Borough improperly paid him at the rate set forth in the 2000 CBA and the unexecuted 2003 CBA.

The Borough's position was that Grievant received the appropriate amount under the contract documents between the parties because the 2000 CBA and 2003 CBA both call for a 2.5% increase when there is a classification change. The Borough contended that it has applied this language consistently and that it remains unaltered by the MOU and Skonier Award. According to the Borough, the Chief of Police simply misinformed Grievant about his upcoming salary increase, and, because the Chief of Police has no authority in this regard, his error is not binding on the Borough.

After the close of the record, the parties submitted post-hearing briefs to the AAA for distribution. Subsequently, the Borough alleged that the Union's post-hearing brief contains six factual assertions that were not testified to during the hearing

(contested statements),[5] and on June 20, 2007, the Borough filed a motion with the AAA, seeking to re-open the record to strike the contested statements (Motion).

Without ruling on the Borough's Motion, the Arbitrator issued an award on June 22, 2007. Noting the parties' agreement that this is a contract interpretation case, the Arbitrator considered the evidence presented, determined witness credibility and made findings in order to interpret the various contract documents/arbitrator awards and their application. Ultimately the Arbitrator sustained the grievance in part and denied the grievance in part. The Arbitrator directed the Borough to pay Grievant at a rate equal to that paid to other PO1s, or $19.61 per hour; however, the order was not retroactive but, instead, took effect as of the April 27, 2007, hearing date.[6]

The AAA received the award from the Arbitrator and issued it to the parties on June 25, 2007. On July 11, 2007, the Un-

ion filed an objection to the Borough's Motion; however, to this date, no official action has been taken to rule on the Motion or re-open the record.

On July 20, 2007, the Borough filed a petition for review of the Arbitrator's award, arguing that the award should be vacated because irregularities in the arbitration process deprived the Borough of its due process rights and that the Arbitrator exceeded his authority in issuing the arbitration award. Following argument, the trial court issued an order dated September 26, 2007, denying the Borough's petition for review and upholding the Arbitrator's award. The Borough now appeals to this court.

■■■ It is now well settled that the scope of review in an appeal of an Act 111 grievance arbitration award is that of narrow certiorari. *Pennsylvania State Police v. Pennsylvania State Troopers' Association*, 540 Pa. 66, 656 A.2d 83 (1995) (*Be-*

---

5. The six "contested statements" are:

a. "The Township had previously conceded to a departure from the provisions of Article XIV, partially because it had already been paying officers in excess of the scale when two (2) officers (Gyurina and Hagameyer) advanced to Patrolman 1 level in 2002."

b. "When those officers reached the Patrolman 1 level in 2002, they were not simply paid a 2.5% increase as called for in the contract, but rather were brought up to the level of the other officer who held Patrolman 1 status, Officer Metzger. In this manner, a new salary scale was offered by the Borough."

c. "Under the Borough's proposal, all officers holding Patrolman 1 status were to be paid the same (Officers Metzger, Gyurina, and Hagameyer)."

d. "Further, he advised that the salary scale which was offered by the Borough, and which formed the basis of the parties' agreement commencing January 1, 2003, was contrary to the provisions of Article XIV."

e. "Objecting to the retention of the '2.5% advancement' language of Article XIV as proposed, the Union refused to sign this consolidated contract."

f. "The Chief of Police prepares the department Budget and is a managerial employee. With respect to both budgeting, and submission of Hockman's PO1 adjustment, the Chief of Police relied upon all PO1's being paid at the same rate."

(Borough's brief at 14–15.)

6. The Arbitrator concluded that the Borough misunderstood the terms of the MOU and incorrectly calculated Grievant's pay rate in good faith, and, therefore, should not be held hostage for its good faith effort. The Arbitrator also stated that, if the parties wish to change or modify the language of the MOU through an amendment or a side letter, or during their next contract negotiations, they are encouraged to do so. Finally, the Arbitrator limited this decision, stating that, because of the unique facts of this case, it is not to be cited as precedent unless there are identical factual circumstances. (Arbitrator's op. at 24–25, R.R. at 107a–08a.)

*tancourt* ). Narrow certiorari permits inquiry only into the following four aspects of an Act 111 arbitrator's award: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; and (4) deprivation of constitutional rights. *Town of McCandless v. McCandless Police Officers Association,* 587 Pa. 525, 901 A.2d 991 (2006); *Betancourt.* Here, the Borough argues that the latter three questions encompassed by narrow certiorari are implicated.

▆ The standard by which we review an arbitrator's determination of these issues depends on the nature of the issue in the case. *Pennsylvania State Police v. Pennsylvania State Troopers Association,* 840 A.2d 1059 (Pa.Cmwlth.), *appeal denied,* 578 Pa. 711, 853 A.2d 363 (2004). Where resolution of the issue turns on a pure question of law, or the application of law to undisputed facts, our review is plenary. *McCandless.* However, where it depends upon fact-finding or upon interpretation of the collective bargaining agreement, we apply the extreme standard of deference applicable to Act 111 awards; that is, we are bound by the arbitrator's determination of these matters even though we may find it to be incorrect. *City of Philadelphia v. Fraternal Order of Police Lodge No. 5,* 932 A.2d 274 (Pa. Cmwlth.), *appeal granted,* 595 Pa. 403, 938 A.2d 986 (2007); *Pennsylvania State Police.*

As the trial court correctly observed, the parties here held differing interpretations of the relevant contract documents, disagreeing as to which documents control the wage rates and whether certain CBA terms had been altered by the MOU and the Skonier Award. Moreover, the parties agreed that this was a contract interpretation case, and it is evident that the Arbitrator treated it as such. Because the

Arbitrator's award was based on the Arbitrator's findings of fact and interpretation of disputed contract terms and conditions, our standard of review is one of extreme deference to the Arbitrator.

The Borough first argues that the Union's submission of the contested statements after the conclusion of the arbitration hearing constituted a procedural irregularity that violated the Borough's due process right to a full and fair hearing before the Arbitrator. According to the Borough, inclusion of these contested statements meant that: the Borough was deprived of the opportunity to respond with countervailing evidence or to cross-examine witnesses; the Union was freed of the need to submit any testimony or evidence to support the contested statements; and the Arbitrator based his award on, or was influenced by, improper evidence. The Borough cites numerous cases for the proposition that parties to arbitration are entitled to a full and fair hearing, including the right to be present when new testimony is presented to the arbitrator so that there can be an opportunity for cross-examination and rebuttal. The Borough maintains that, in light of these essential principles of due process, the Union's untimely insertion of the contested statements into the record created an irregularity in the arbitration proceedings that required the trial court to vacate the award and remand for a new hearing before a different arbitrator.

▆ However, in making its argument, the Borough asked the trial court, and now this court, to accept its assertion that the contested statements are new facts that are completely unsupported by the record at face value. In reviewing an arbitration award for such irregularities, the trial court "is limited only to a review of the record presented to it." *West Pottsgrove*

*Township v. West Pottsgrove Police Officers' Association,* 791 A.2d 452, 458 (Pa. Cmwlth.2002) (quoting *Borough of Dormont v. Dormont Borough Police Department,* 654 A.2d 69, 72 (Pa.Cmwlth.), *appeal denied,* 541 Pa. 628, 661 A.2d 875 (1995)). Moreover, the burden was on the Borough to ensure that a record was maintained and filed.[7] Because the Borough failed to provide a record of the arbitration hearing to the trial court, there was nothing for the court to consider and compare against the alleged irregularities and, therefore, there can be no support for the Borough's allegations. Similarly, absent a record of the arbitration hearing, this court cannot presume that the Arbitrator here based his award on anything outside of the evidence

presented at the hearing.[8] Thus, as the trial court correctly held, the Borough's argument fails for want of record evidence.[9]

The Borough also claims that "[t]he irregularity of the arbitration proceedings was exacerbated by the AAA's failure to properly handle the Borough's Motion to Re–Open the Record to Strike the Contested Statements." (Borough's brief at 20.) The Borough filed its Motion pursuant to the AAA's Labor Arbitration Rule 32 (Reopening of Hearings),[10] which provides (emphasis added):

> The hearings *may* for good cause shown be reopened by the arbitrator at will or on the motion of either party at any time

---

7. Provisions of the Uniform Arbitration Act (UAA), 42 Pa.C.S. §§ 7301–7320, that are consistent with Act 111 are applicable to Act 111 proceedings. *Township of Sugarloaf v. Bowling,* 563 Pa. 237, 759 A.2d 913 (2000). One such provision provides that a record shall be made upon the request of a party. 42 Pa.C.S. § 7307(b). Read in conjunction with section 8 of Act 111, 43 P.S. § 217.8, which provides that any stenographic expenses will be paid by the political subdivision, this provision places the burden of requesting and making a record on the Borough. Moreover, as the appellant here, it was incumbent on the Borough to file that record with the court or risk dismissal of the appeal. Pa. R.A.P. 1911(a), (d); *see also Spino v. John S. Tilley Ladder Co.,* 448 Pa.Super. 327, 671 A.2d 726 (1996) (the responsibility for providing a complete record for purpose of appellate review is borne by the appellant), *aff'd,* 548 Pa. 286, 696 A.2d 1169 (1997); *Smith v. Smith,* 431 Pa.Super. 588, 637 A.2d 622 (1993) (failure by appellant to insure that the record for review contains sufficient information to conduct a proper review constitutes a waiver of the issues sought to be examined), *appeal denied,* 539 Pa. 680, 652 A.2d 1325 (1994).

8. The Union maintains that it did not insert facts not of record into its post-hearing brief but, rather, fairly characterized evidence actually presented to the Arbitrator through testimony and exhibits. The only evidence of what may have been presented before the

Arbitrator is what is reflected in the Arbitrator's opinion and award, which does not reflect that the Arbitrator based that award on the six contested statements.

9. The Borough asserts that the lack of a transcribed record cannot defeat a claim of irregularity in the proceedings. According to the Borough, because it is quite common for arbitration proceedings to take place without a stenographer, it would be detrimental to the arbitration process to hold that claims of irregularity cannot be sustained without a transcribed record from the arbitration. We disagree that the Borough should be granted relief in the absence of a record. In fact, this court has recognized that, although a stenographic record is not required in arbitration cases, a party always may avail itself of the clear legal right to request a record of the arbitrator's hearing. *City of Scranton v. Shoemaker,* 59 Pa.Cmwlth. 141, 428 A.2d 1048, 1051 (1981) (rejecting the City of Scranton's argument that its right to effective appeal was prejudiced by a lack of a record of the arbitrator's hearing and holding that "Scranton cannot now expect this Court to grant relief because Scranton may have been prejudiced by its own failure to protect itself.").

10. American Arbitration Association, Labor Arbitration Rules; Amended and Effective August 1, 2007, is found at http://www.adr.org/sp.asp?id=32599# 32.

before the award is made but, if the reopening of the hearings would prevent the making of the award within the specific time agreed upon by the parties in the contract out of which the controversy has arisen, the matter may not be reopened unless both parties agree to extend the time. When no specific date is fixed in the contract, the arbitrator *may* reopen the hearings and shall have 30 days from the closing of the reopened hearings within which to make an award.

■ Although recognizing that this rule places no absolute obligation on the Arbitrator to re-open the record, the Borough maintains that it was entitled to some decision on its Motion because due process requires that all issues raised by a party be addressed. The Borough contends that the fact that this did not occur has led to an incomplete record on appeal, and, therefore, at a minimum, the trial court should have remanded the matter to the AAA and the Arbitrator for a decision on the Motion. Again, we disagree.

As noted, the use of the term "may" in Rule 32 indicates that the Arbitrator is not mandated to re-open a record upon a party's motion. Moreover, Rule 32 does not indicate that reversible error has occurred if the record is not re-opened upon such a motion. On this basis, the trial court held that "no irregularity is caused in the proceeding if the Arbitrator elects to refrain from opening the record." (Trial ct. op. at 15.) However, as the Borough points out, the Arbitrator here did not *expressly* deny the Borough's Motion; instead, the Arbitrator simply issued the award, thereby *impliedly* choosing not to re-open the record. Even assuming that the Arbitrator's failure to issue a formal decision on the

Motion was error, it is harmless error under the present circumstances.

The Borough makes it very clear that it filed its motion to re-open the record for the sole purpose of striking the contested statements, and it now contends that issuing the arbitration award without first responding to or granting that Motion has led to an award that is unjust, inequitable and inaccurate in that it is based on improper statements made in the Union's post-hearing brief. However, as we previously noted, other than its bald assertion that the Union submitted new facts after the hearing, the Borough articulates absolutely no grounds, much less good cause, on which to base a grant of its Motion. In essence then, through its Motion, the Borough seeks to make up for its failure to provide a record on appeal. We decline to afford the Borough this second opportunity.

■ Finally, the Borough argues that the Arbitrator exceeded his authority because, in issuing an award directing that Grievant be paid the same as other PO1s, the Arbitrator added to and/or altered the language in the CBA.[11] In making this argument, the Borough assumes that the terms of the contract documents clearly and unambiguously reflect the Borough's position that officers reaching the PO1 status receive a pay increase in an amount equal to 2.5% of the PO3 salary, as provided in Article XIV, Section A of the 2000 and 2003 CBAs and the MOU. However, as the trial court correctly observed, the pay raise terms of the contract documents are neither clear nor unambiguous, but, rather, required interpretation by the Arbitrator, an act properly within his powers under case law and the CBA.

---

11. Article XV, Section E, of the CBA states: "[t]he arbitrator selected shall only have the authority to *interpret* and apply the provisions

of this agreement. It shall have no authority to add to, detract from or alter its terms." (R.R. at 79a, emphasis added).

In *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5,* 564 Pa. 290, 299, 768 A.2d 291, 296–97 (2001), our supreme court stated:

> "[o]ur definition of what constitutes 'an excess of an arbitrator's powers' [is] far from expansive." *Pennsylvania State Police v. Pennsylvania State Troopers Association,* 559 Pa. 586, 741 A.2d 1248, 1251 (1999). Essentially, if the acts the arbitrator mandates the employer to perform are legal and relate to the terms and conditions of employment, then the arbitrator did not exceed her authority. *Id.* Act 111 has defined "terms and conditions of employment" as "including compensation, hours, working conditions, retirement, pensions and other benefits. . . ." 43 P.S. § 217.1. Finally, we have stressed that a mere error of law will not support a finding that the arbitrator exceeded her powers. *Pennsylvania State Police,* 741 A.2d at 1251.

In this case, the Arbitrator's award did not mandate that the Borough carry out an illegal act; the raise in wage rate for Grievant was an act that could have been voluntarily performed by the Borough and was not in contravention of a statute. Furthermore, the award certainly was related to the terms and conditions of employment as it concerned employment salary. Therefore, the Arbitrator did not exceed his powers, and his award withstands scrutiny under the narrow certiorari scope of review.

Accordingly, we affirm.

### ORDER

AND NOW, this 17th day of October, 2008, the order of the Court of Common Pleas of Lycoming County, dated September 26, 2007, is hereby affirmed.

CONCURRING OPINION BY Judge LEAVITT.

I agree that in this particular case, the absence of a record is fatal to the Borough's claim that it was denied a fair hearing because the Union's brief made statements that the Borough believes are beyond the record evidence.[1] I write separately only to observe that it does not follow that a record will always be required in order to raise a due process claim.

---

1. As noted by the majority, it does not appear these six contested statements were relevant to the award.